## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

TIA M. MALMQUIST,

        Plaintiff,

vs.

MICHAEL J. ASTRUE, Commissioner
of Social Security,

        Defendant.

No. C07-3085-MWB

**REPORT AND RECOMMENDATION**

---

## I.  INTRODUCTION

The plaintiff Tia M. Malmquist seeks judicial review of a decision by an adminis-
trative law judge ("ALJ") denying her applications for Title II disability insurance ("DI")
and Title XVI Supplemental Security Income ("SSI") benefits.  Malmquist claims the ALJ
erred in concluding that drug addiction or alcoholism was a material factor contributing
to her disability, and otherwise in evaluating and weighing the evidence.  (*See* Doc. No. 8)

## II.  PROCEDURAL AND FACTUAL BACKGROUND

### A.  Procedural Background

On June 26, 2006, Malmquist filed applications for DI and SSI benefits, alleging
a disability onset date of August 26, 2005.  (R. 71-79).  Malmquist claims she is disabled
due to bipolar disorder, depression, post-traumatic stress disorder, and back problems.
She claims these impairments prevent her from standing, walking, or sitting for very long,
and from doing "a lot [sic] of things."  (R. 93)

Malmquist's applications were denied initially and on reconsideration.  (*See* R. 30-
34)  Malmquist requested a hearing, and a hearing was held on June 5, 2007, before
Administrative Law Judge ("ALJ") John Sanbothe.  (R. 468-96)  Malmquist was

represented at the hearing by attorney Kenneth Johnson. Malmquist was the only witness who testified at the hearing. Interrogatories were sent to Vocational Expert ("VE") Elizabeth Albrecht (*see* R. 181-85), and the ALJ considered the VE's responses to the interrogatories, which appear in the record. (*See* R. 29; 186-88) On July 11, 2007, the ALJ issued an unfavorable decision, finding that although Malmquist is unable to return to any of her past work, she retains the residual functional capacity to perform other jobs that exist in sufficient numbers in the national economy. (R. 16-29) Malmquist appealed the decision, and on October 11, 2007, the Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner. (R. 8-11)

Malmquist filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 1) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of the case. Malmquist filed a brief supporting her claim on April 30, 2008. (Doc. No. 8) The Commissioner filed a responsive brief on June 27, 2008. (Doc. No. 11) Malmquist did not file a reply brief. The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Malmquist's claim for benefits.

## B. Factual Background

### 1. Introductory facts and Malmquist's hearing testimony

Malmquist was born in 1969, making her thirty-eight years old at the time of the hearing. She lives alone in a house in Fonda, Iowa. She is 5'4" tall, and weighs 154 pounds. She completed the tenth grade in school with "some tutoring," and later earned a G.E.D. She has some difficulty reading. She is right-handed. (R. 471, 485) She has two daughters, ages eighteen and twelve, both of whom live with their fathers. (R. 477-78, 485)

Malmquist worked for fifteen years as a certified nursing assistant ("CNA") at a nursing home. In addition, she worked part-time for several months as a cashier at a store. (R. 472) At the time Malmquist alleges she became disabled, she was working as a CNA at a nursing home. She left the job due to back pain, and an inability to focus on her work due to depression. (R. 473-74) She has had problems with depression since she was a teenager, and she has attempted suicide and has been hospitalized for depression in the past. (R. 474-75)

When Malmquist was sixteen years old, she was kidnapped by several men in a van. The men kept her tied to a towel rack in a bathroom, and they raped and abused her repeatedly for several weeks. She eventually was rescued, and was hospitalized for a couple of weeks for treatment of dehydration and the physical abuse. She received some counseling following the incident, and has continued to receive counseling periodically throughout her life. (R. 475-77, 481)

Malmquist indicated her post-traumatic stress disorder ("PTSD") has worsened over the past couple of years because she has begun to have "flashbacks" of the events surrounding her kidnapping. She is afraid to leave her house alone and she has problems functioning around men. She also is fearful whenever she sees a van. She has difficulty concentrating and her thoughts race. She stated she has been hospitalized for mental health reasons, both voluntarily and involuntarily, on several occasions during her adult life, and she has attempted suicide as an adult by overdosing on drugs. Her most recent hospitalization for mental health problems was about a year-and-a-half prior to the ALJ hearing, when she was hospitalized for depression following a suicide attempt. (R. 478-82)

Malmquist deals with her depression by sleeping a lot, often up to sixteen hours a day. She described her general energy level as "[v]ery low," and her memory and concentration as "[t]errible." (R 482) She does not deal well with stress and pressure, and

she has problems communicating with both men and women. (R. 482-83) Malmquist's younger daughter lived with her for about a year, but in the spring of 2007, she returned to live with her father. Malmquist stated that since her daughter left, she has become more depressed. (R. 482-83)

To treat her depression, Malmquist sees a counselor, but she stated the therapy sessions do not help her. She takes Lexapro and Ritalin, which help calm her racing thoughts somewhat. Sometimes when she goes out in public, Malmquist has panic attacks and feels she cannot breathe. She also gets migraine headaches, usually about twice a month. If she does not take medication soon enough, a migraine headache may last up to three days. (R. 483-84)

Malmquist has problems with back pain that started in August 2005. According to her, she has been diagnosed with "some fusion of the spine and degenerative disc . . . disease." (R. 485) She has a constant, sharp pain in her mid-back, sometimes radiating down her left arm and causing a "tingling numbness" in her arm. (R. 485-86, 493) She estimated she can walk no more than a city block at a time because as she walks, her pain increases. She can stand for ten to twenty minutes at a time, and sit for ten to fifteen minutes at a time, before she has to change positions. (R. 486-87) She stood up several minutes into the ALJ hearing. (*See* R. 484) She spends most of her time lying on the couch with a heating pad. (R. 487) She has problems with most types of postural activities including bending, stooping, crawling, and kneeling; climbing stairs, ramps, and inclines; and picking things up off the floor. She estimated she can lift five to ten pounds. (R. 488) When she worked as a CNA, she sometimes had to lift patients, which caused pain in her back. (R. 489)

Malmquist stated she could not return to work as a CNA because of her back pain and her mental problems. She also could not return to work as a cashier, which required

her to stand most of the day.  She believes she is unable to complete a normal eight-hour work day on a regular basis due to her mental problems.  (R. 489-90)

Malmquist began using alcohol and other drugs as a teenager, starting at least as young as age sixteen, following her abduction.  After she quit working in August 2005, Malmquist did not use illegal drugs, but she continued to drink.  Her drink of choice was beer, and she would drink to the point of intoxication once or twice a month.  At the time of the hearing, she indicated she had been sober for about a month or two.  The last time she drank, she did not become intoxicated; she "just had a couple of beers and stopped." (R. 490-91, 495)  She continues to have thoughts of self-harm a couple of times a week, and she has instructions to call her counselor if those thoughts become overwhelming.  (R. 492)

In general, Malmquist stated she has problems functioning in her normal, day-to-day life.  She spends her days watching TV and sleeping.  She is able to perform her own self-care, but she does not cook or clean every day.  She sometimes reads or works on a puzzle.  (R 494)

## 2.    *Malmquist's medical history*

### a.    *History of back problems*

On June 2, 2004, Malmquist was evaluated by a physical therapist for complaints of a two-month history of "pain up and down her entire spine from the base of the occiput down to [the] sacrum."  (R. 270-71)  Malmquist was not aware of any precipitating event. She rated her pain at a 10 out of 10 without medication, but stated her current medications, consisting of Trazodone, Celebrex, Percocet, and Paxil, provided her with some relief. The therapist noted Malmquist was not guarded during her evaluation, she moved "quite well," and she reportedly was "able to perform [her] job quite well most of the time and

. . . [was] still quite functional." (*Id.*) No additional physical therapy sessions were scheduled.

In mid-June 2004, Malmquist was evaluated by a specialist for complaints of back pain. She was taking Hydrocodone, which had been prescribed by her family doctor. An MRI and bone scan showed a congenital abnormality at T3-T4. However, Malmquist moved without difficulty and the doctor noted her subjective complaints were "much worse than any objective findings." (R. 193; *see* R. 195) The specialist switched Malmquist to Ultram, noting narcotics did not seem to be indicated, but she apparently called her family doctor and went back on Hydrocodone.

On August 12, 2004, Malmquist was evaluated for pain management by Nadeem M. Ahmed, M.D. (R. 244-53) Malmquist reported pain throughout most of her spine, extending from her neck to her tailbone. She described the pain as aching and sharp, and constant in nature. She had tried physical therapy but had not found it useful, and she had not tried other types of therapies. She indicated the pain affected her ability to function, disturbed her sleep, and increased with walking, heavy lifting, and physical activity. She stated hydrocodone only decreased her pain by about 10%, and the effects only lasted thirty to forty minutes. Dr. Ahmed noted Malmquist appeared to be in discomfort due to pain. (R. 244-45) She had restricted flexion and extension, significant muscle spasm, and "significant mid thoracic tenderness and mild tenderness in the cervical and lumbar region." (R. 246-47) The doctor reviewed Malmquist's MRI and bone scan, as well as the specialist's notes. Dr. Ahmed assessed Malmquist with "[t]horacic pain secondary to spinous process fusion and bony deformity," and "[m]yofascial pain syndrome." (*Id.*) He gave Malmquist a thoracic epidural steroid injection. He prescribed Ibuprofen 800 mg three times daily; Ultracet, up to four daily as needed; and amitriptyline 25 mg in the evening to help with pain control during the night. He recommended physical therapy and a TENS unit trial.

Malmquist was seen for a neurosurgery consult on July 8, 2004, and a computed axial tomography scan was recommended to rule out the possibility of a myeloma or other spinal tumor. (R. 300-02) The scan was performed on July 15, 2004, but no significant pathology was identified that would be amenable to surgical treatment, and no other cause for her diffuse back pain was identified. The doctor recommended she be seen at a pain clinic. (R. 299) She had x-rays of her back the same day that showed some "small end plate spurs within the mid-thoracic spine," a probable widening of the junction at T12, and a congenital fusion at T3-4. (R. 303-04) The doctor's only explanation for Malmquist's back pain was to suggest it likely was muscular in origin and should "improve with time and therapy." (R. 298) He opined she could perform all postural activities without restrictions except as might be required due to her pain tolerance. (*Id.*)

Malmquist was seen in the pain clinic in December 2004. She described her pain as a constant, "aching miserable pain that goes up to a 9 on a scale of 0 to 10." (R 198) Pain pills, ice, and heat helped the pain somewhat. She received two injections in the supraspinous ligaments at approximately the T4-5 and T5-6 levels. She received prescriptions for Salsalate and Desipramine, and a TENS unit, and she was scheduled for a CT scan. (R. 198-202)

On January 10, 2005, Malmquist underwent a CT scan of her spine from C7 down through L1. The scan revealed a "[c]ongenital fusion of posterior elements and partial fusion of bodies of T3 and T4 without spinal stenosis or neuroforaminal stenosis"; and "[m]ultilevel degenerative disc disease between T7 and T12 with associated mild anterior hypertrophic fringing of vertebral bodies." (R. 324) The scan also revealed a small nodule in Malmquist's right upper lung that had been noted on a previous scan. (*Id.*)

On June 6, 2005, Malmquist had x-rays of her thoracic spine that showed no changes since her June 2004 study; i.e., she continued to have a congenital fusion at T3 to T4, and "[m]ultilevel disc desiccation/degenerative disc disease of the lower thoracic

spine most marked at T7-8 and T8-9 levels with end plate cupping T8 superior/inferior and T9 superior consistent with Schmorl's nodes." (R. 295) A repeat bone scan and MRI also showed no changes since June 2004. (R. 293, 95)

During a hospitalization for mental health issues in January 2006 (discussed *infra*), Malmquist was examined by Phillip A. Deffer, M.D. for complaints of back pain. He noted Malmquist had "an 18 month history of back pain that started atraumatically." (R. 379) She had been diagnosed with "some thoracic disc disease" and had been "treated with high dose narcotics." (*Id.*) He reviewed x-rays taken on January 12, 2006 (*see* R. 291), that showed "endplate degenerative changes at T12/L1, L-2/3, and L-3/4" with "very slight disc height narrowing at L-3/4 and T-12/L-1." (R. 291) The radiologist noted that the existence of a slight compression fracture could not be ruled out entirety. (*Id.*) that showed "endplate degenerative changes at T12/L1, L-2/3, and L-3/4" with "very slight disc height narrowing at L-3/4 and T-12/L-1." (R. 291) The radiologist noted that the existence of a slight compression fracture could not be ruled out entirely. (*Id.*)

Upon physical examination, Dr. Deffer noted the following:

> She walks easily down the hallway with no evidence of any discomfort. She can easily lay down and sit up without any pain. She has negative straight leg raise, negative cross-straight leg raise and neurologic examination is normal. She has no tenderness to palpation as I palpate along her spine. She has no paravertebral spasm. She is able to easily take off and put on her sweatshirt without any evidence of pain. She does not grimace in pain. She does not appear to be in any discomfort, although as she is talking to me, she is asking me for pain medicine.

(R. 379) The doctor's impression was "[a]pparent thoracic disc pathology with a long history of narcotic use." (*Id.*) He had no treatment recommendations, noting Malmquist

had already been evaluated extensively. He recommended she not be treated with narcotics other than perhaps low-dose Tylenol with Codeine. (*Id.*)

On September 5, 2006, Nabil T. Khoury, M.D. performed a comprehensive disability examination of Malmquist at the request of Disability Determination Services. (R. 329-35) Dr. Khoury noted the following in the History portion of his report:

> [Malmquist] states that she has been having thoraco-lumbar pain for [a] long time. It seems that she has consulted multiple medical doctors, pain specialists without much benefits. It seems that she has congenital fusion of T3-T4 that triggered early osteoarthritis on the thoracic spine. Currently, she is complaining that she has chronic continuous thoraco-lumbar pain, moderate to severe most of the time, aggravated by walking, standing, lifting and bending forward. Her pain never radiates to her lower extremities.
>
> She has also [a] history of depression that seems under control with current antidepressants therapy.

(R. 329)

On physical examination, Dr. Khoury noted tenderness and muscle spasms in Malmquist's lumbar and thoracic spine. Straight-leg-raising test was negative bilaterally. He found Malmquists's symptoms correlated with his examination, and he opined her condition would continue to worsen in the future. (*See* R. 331) He made the following findings regarding Malmquist's functional abilities:

> For the time being,
>
> I think she is able to lift and carry only mild weights frequently.
>
> I think she is unable to stand, move about, walk and sit in an eight-hour workday without frequent breaks.
>
> I think it will be difficult for her to stoop, climb, and crawl without back pain. I think she should be able to kneel without major problems.

> I do not have concerns about her handling objects by hands, seeing, hearing and speaking. Traveling may be difficult for her.
>
> I do not have any concerns about work environment.

(R. 331)

On September 13, 2006, John May, M.D. reviewed the record and completed a Physical Residual Functional Capacity Assessment form. (R. 337-44) He opined Malmquist would be able to lift no more than ten pounds; stand and/or walk for at least two hours in an eight-hour workday; sit for about six hours in the workday; and push/pull without limitation. He opined she could stoop and crouch occasionally, and she would have no environmental, manipulative, visual, or communicative limitations. (*Id.*)

On October 28, 2006, Marie Turner, M.D. reviewed Dr. May's assessment and concurred with his findings in all areas except exertional limitations. Dr. Turner recommended less restrictive limitations than had Dr. May, finding nothing in the record to support "any limitation in walking and standing." (R. 394-95)

On January 18, 2007, Malmquist was seen by Linda McClintock, ARNP, for complaints of "mid back and neck pain for the past 1-1/2 weeks." (R 443) Malmquist opined her pain was caused by housework. She received prescriptions for Nabumetone and Ultram, and an injection of Toradol. (*Id.*)

On March 30, 2007, Malmquist again was seen by Nurse McClintock with complaints of "a lot of back pain." She received an injection of Toradol and a prescription for Salsalate, and x-rays were ordered of her thoracic and lumbar spine. (R. 442)

### b. *Mental health history*

On August 29, 2005, Malmquist was seen by social worker Diane Mangold for a counseling session at the Seasons Center. Notes indicate Malmquist "continues to be very depressed and anxious," suggesting Ms Mangold had seen Malmquist previously. (R. 223)

Malmquist was tearful for most of the session, and expressed feelings of worthlessness. She was having difficulty coping with the stressors of pain, and financial and emotional problems, and she had some thoughts of suicide. Her psychological and occupational impairments were assessed as severe, and her interpersonal impairment was assessed as moderate. Her GAF was assessed at 40, indicating major impairment in several areas such as work, family relations, and judgment. She was considered to be a moderate danger to herself. Notes indicate she was taking Paxil and Valium. (*Id.*)

Malmquist saw her counselor on September 8, 2005. She indicated she had quit work due to back pain, and she felt others viewed her as "dirty and worthless." (R. 222) Her level of impairment was assessed as severe and her GAF was assessed at 50. She continued to take Paxil and Valium. (*Id.*)

Malmquist saw her counselor on September 27, 2005. She was anxious and stated she sometimes felt she should not exist. Her GAF was assessed at 55. A third medication was added to her regimen, but the treatment notes are illegible. (R. 221) At her next appointment, on October 12, 2005, Malmquist was very tearful. She stated she had good and bad days, and she had misused her new medication, taking more than prescribed because it made her feel better. She was having "flashbacks of past trauma of kidnapping," and expressed concern that she would ever be able to recover from the incident. She reported some progress in not using alcohol during the previous two weeks. Her GAF was assessed at 50. Her medications were continued without change, and Malmquist agreed to take them only as prescribed. (R. 220)

Malmquist next saw her counselor on October 26, 2005. Her mood had improved somewhat, though she continued to struggle with feelings of low self-esteem and conflicts with her daughter. Her GAF was assessed at 60. She was still considered to be a moderate danger to herself. (R. 219)

On November 4, 2005, when Malmquist saw her counselor, she stated she was having a lot of back pain, and she was frustrated with the pain and finding it hard to cope. She was spending a lot of time in bed, and was having more arguments with her daughter. Her psychological impairments were assessed as mild, and her GAF was assessed at 60. (R. 218) She returned to see her counselor on November 15, 2005, and stated she was continuing to experience significant back pain. She was sleeping a lot and felt depressed, anxious, and worthless. Her GAF was assessed at 50. (R. 217)

Malmquist saw her counselor on November 22 and December 15, 2005, and on January 4, January 11, February 10, February 14, February 28, March 14, April 10, April 28, May 9, and May 25, 2006. (R. 203-16) During this six-month period of time, Malmquist's GAF varied between 40 and 60. Her mood varied occasionally, but for the most part, she continued to feel depressed and anxious, frustrated by her ongoing back pain, and feelings of worthlessness. After Christmas 2005, she had two relapses of drinking, and her suicidal ideations increased. Her medications were changed, but the new medications made her sleepy and caused her difficulties with concentration.

She was admitted to the hospital on January 11, 2006, due to suicidal ideation. She remained hospitalized for at least nine days.[1] Her diagnoses included Axis I - major depression recurrent, PTSD chronic and delayed, severe; Axis II - borderline personality disorder; Axis III - back pain; Axis IV - substance abuse by history; Axis V (GAF) - "about 20." She was discharged on Seroquel, Lithium, Klonopin, Effexor XR, Vistaril, Imitrex, and Tylenol No. 3. Her GAF on discharge was 30. (R. 378)

During her hospitalization, Malmquist was evaluated for complaints of migraine headaches. After a full evaluation, doctors concluded that although Malmquist described symptoms consistent with migraine headache, she "show[ed] no evidence of typical distress with migraine cephalgia." She was unaffected by bright lights and loud noises, and

---

[1]The actual date of discharge is illegible. It could be January 20, 26, 28, or 29. (*See* R. 378)

showed no evidence of distress. (R. 382-83) However, she had been treated with Imitrex twice on the day of her examination, and Malmquist stated she had not had a headache of similar severity "in about six years time." (R. 383) The doctor speculated that rather than typical migraine headache, Malmquist might be suffering from a headache secondary to caffeine withdrawal, as well as her recent medication changes. He opined the Tylenol with Codeine prescribed for Malmquist's back pain also might help her headache, and he also recommended Excedrin Migraine, noting Malmquist had reported good relief with the medication in the past. (*Id.*)

Malmquist had another alcohol relapse in mid-March 2006, and experienced feelings of hopelessness and shame as a result of the relapse. She continued to sleep most of the time throughout this period, and she often was tearful during her counseling sessions.

On May 9, 2006, Malmquist was evaluated by Eileen M. Middleton, PA-C, who reviewed Malmquist's case with a psychiatrist. P.A. Middleton noted Malmquist had been hospitalized in January 2006, due to feelings of significant depression and thoughts of self-harm. At that time, Malmquist apparently was diagnosed with Bipolar Mood Disorder and PTSD. (*See* R. 203) A mental status examination showed Malmquist to have mildly-impaired memory and concentration, and some suicidal ideation. Her GAF was assessed at 44. Her medications were adjusted, with a goal of discontinuing Lithium, which Malmquist reported gave her significant negative side effects. (R. 203-05)

On May 29, 2006, Malmquist was hospitalized involuntarily due to suicidal thoughts. Her chief complaint was noted to be, "I really do not have any reason to live." (R. 226) She had relapsed on alcohol the previous day, drinking "three beers and then one Southern Comfort." (*Id.*) Her daughter became concerned about her and called her grandfather, who called the police and obtained a court order for Malmquist's hospitalization. In her psychiatric history, Malmquist reported that she was first hospitalized for suicidal thoughts at the age of four, and she has been depressed all of her

life.  During the present hospitalization, doctors diagnosed her with a major depressive disorder, severe, without psychosis, rule out bipolar disorder; likely PTSD; and personality disorder not otherwise specified.  Her GAF was assessed at 35, with 50 being the highest during the past year.  Malmquist's mood improved during her four-day hospitalization, and she was released with prescriptions for Paxil-CR 12.5 mg daily, Lithium 600 mg at bedtime and 300 mg in the morning, and Ativan 1 mg every six hours as needed.  Malmquist agreed to follow up with her counselor.  (R. 224-28)

On June 13, 2006, Malmquist saw P.A. Middleton for a medication review. Malmquist was "quite anxious and nervous," and she described her hospitalization in May. She stated she "was released with the prescription of Ativan, which she admit[ted] she took all in one sitting and then slept for three days."  (R. 413)  She was seeing a therapist regularly, and was taking Lithium and Paxil.  P.A. Middleton noted Malmquist's mood was anxious, she was tearful, she was fidgety and exhibited some psychomotor agitations, and she had difficult concentrating.  Her GAF was assessed at 40.  She was continued on the Lithium, her Paxil was increased, and Abilify and Lunesta were added to her medication regimen.  She was encouraged to continue seeing her therapist as often as possible.  (R. 413-14)

Malmquist saw her counselor on June 29, 2006.  She reported struggling with anxiety every afternoon, and she was having flashbacks of the faces of the men who raped her.  However, her feelings of depression had lessened somewhat.  (R. 430)

On August 22, 2006, Malmquist was seen by Nurse McClintock with a request to go back on Paxil, and also for medication for her back pain.  She was given prescriptions for Diclofenac, Methocarbamol and Paxil.  (R. 448)

On August 31, 2006, Malmquist was taken to the hospital by ambulance after taking an overdose of Robaxin, a muscle relaxant, together with four beers.  She stated she was depressed.  She was treated with an emetic and IV fluids, and was admitted for overnight

observation. (R. 306-17) The following day, she was transferred to the Spencer Hospital and was involuntarily committed to the mental health unit. She admitted she wanted to die and was deemed a threat to herself. (R. 318-21) When Malmquist was admitted to Spencer Hospital, she was noted to have "poor impulse control and bouts of depression secondary to back problems." (R. 373) She was diagnosed with depressive disorder not otherwise specified, alcohol abuse/dependence, PTSD, and borderline personality disorder. Her GAF was assessed at 45. Doctors prescribed Paxil CR, and encouraged Malmquist to attend Alcoholics Anonymous upon discharge. (R. 375)

Malmquist saw her therapist on September 8, 2006. She described her recent overdose, and stated she had been struggling emotionally. She was staying in bed for long periods of time. Treatment goals were to decrease her depression and to build a personal support system through A.A. and church. (R. 429) She next saw her therapist on September 12, 2006. She reported feelings of low self-worth and expressed concern that this would never improve. She continued to struggle with depression and self-esteem issues. She had not had any alcohol "for a couple of weeks." (R. 428)

On September 22, 2006, William E. Morton, Psy.D. performed a psychodiagnostic evaluation at the request of DDS. (R. 345-47) Dr. Morton noted the following with regard to Malmquist's self-reported activities of daily living:

> Ms. Malmquist currently lives alone in a single-family home. She is able to drive in town. She requires transportation assistance in regard to obtaining medical care. She requires no assistance in regard to taking medications. Ms. Malmquist gets almost no exercise. She sleeps approximately 16 hours per 24-hour day. She has no history of in-home accidents. She is able to participate in meal preparation and clean up. The most complex food she is able to prepare by herself is steak. Ms. Malmquist reports that, in general, her home is messy and disorganized. She is able to participate in straightening up the home. She is able to participate in outside work. She is able to participate in laundry care. She is able

to groom at an adequate level by herself. She is not able to adequately manage finances without the assistance of others. She is not able to control impulses related to spending money. She is usually able to shop successfully without physical assistance. She does not make major purchases. In general, her overall level of independent functioning is adequate aside from money management.

(R. 345-46)

Malmquist exhibited normal thinking ability and verbal expressive ability. She evidenced no memory impairment, and she appeared to have fair judgment and reasoning. Screening was positive for depression, including difficulty falling asleep, frequent waking during the night, "appetite disturbance; irritability; tearfulness; loss of concentration; loss of motivation; little or no energy; fatigue; subjective feelings of sadness; anhedonia; social isolation; feelings of worthlessness; and feelings of hopelessness." (R. 346-47)

Dr. Morton's diagnostic impressions included PTSD; Major Depressive Disorder, Recurrent, Moderate; and Alcohol Dependence. He assessed her GAF at 55. He concluded she would have mild mental limitations in carrying out instructions, and maintaining attention, concentration, and pace; minimal limitations in remembering and understanding instructions, procedures, and locations; and moderate mental limitations in interacting appropriately with supervisors, coworkers, and the public, and in using good judgment and responding appropriately to changes in the workplace. (R. 347)

On September 26, 2006, Malmquist saw P.A. Middleton for a medication review. Malmquist described her one-night stay in the hospital in September, and stated she had "been feeling fairly well since." (R. 412) She had remained sober and had been busy helping out around her boyfriend's farm. Her anxiety level was reduced. She was seeing a therapist regularly and planned to continue with this. Her GAF was assessed at 50. She was continued on Lexapro, and was encouraged to attend A.A. meetings and remain sober. (*Id.*)

Malmquist saw her counselor on September 29, 2006.  Her mood was improved, but she complained of forgetfulness.  (R. 427)

On October 4, 2006, Rhonda Lovell, Ph.D. reviewed the record and completed a Mental Residual Functional Capacity Assessment form (R. 349-52), and a Psychiatric Review Technique Form (R. 353-66) regarding Malmquist.  Dr. Lovell opined Malmquist would have moderate limitations in the ability to complete a normal workday and workweek without interruptions form psychologically-based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, and to respond appropriately to changes in the work setting.  She found no other significant functional limitations in Malmquist's mental abilities.  She found Malmquists's credibility to be eroded by her inconsistent reports of marijuana use, and her abuse of alcohol.  (*Id.*)

Malmquist saw her counselor on October 12, 2006.  Her mood was anxious and she reported having some depression, although this was slightly better.  Her anxiety attacks were less frequent.  She felt she might be at the start of a manic phase.  She was scheduled for follow-up in one week to check the status of her mood and to determine if she was in a manic state.  (R. 426)

On October 31, 2006, Russell Phillips, Ph.D. reviewed Dr. Lovell's assessment and concurred with her conclusions.  (R. 388-91)  Dr. Phillips opined Malmquist could "sustain concentration for two hours at a time and persist at simple tasks over eight- and forty-hour periods despite her mentla [sic] impairments"; and "tolerate simple changes in routine, and make/carry out simple plans."  (R. 393)  He further opined that Malmquist's "ability to travel independently and avoid hazards would depend on her substance use."  (*Id.*)

On November 14, 2006, Malmquist saw P.A. Middleton for a medication review.  Malmquist reported her depression was somewhat worse, and she was discouraged because her application for disability benefits had been denied.  She was having difficulty with a

boyfriend and with finances. Her GAF was assessed at 55. Her Lexapro dosage was increased, and Seroquel was added at night to help her sleep and to help control her racing thoughts. (R. 397)

Malmquist saw her counselor on November 27, 2006. She reported an alcohol relapse and stated she "had taken large amounts of pills." (R. 425) She had been sober for a few days and stated she felt she would die if she could not stay sober. She planned to attend A.A. and spend time with a friend. She was scheduled for follow-up in one week. (*Id.*) She returned to see her counselor on December 5, 2006. She was staying sober but was fearful about her future, stating she did not "know how to keep going without some income." (R. 424) She saw her counselor again on December 15, 2006. She was remaining sober. She had increased anxiety and had vivid flashbacks of her kidnapping and rape during the session, leaving her feeling "very shaken." (R. 423) A friend planned to stay with her for support. (*Id.*)

Malmquist saw her counselor on January 3, 2007. Her mood was good and she was happy that she had remained sober for one month. She had two good friends who were supporting her in maintaining her sobriety. Her depression was slightly improved. (R. 422)

On January 9, 2007, Malmquist saw P.A. Middleton for a medication review. Malmquist reported "doing very well," and having a greatly improved outlook. She had remained sober, had been exercising, and had made a few girlfriends. She stated she struggled with some anxiety and racing thoughts at times, particular in the late afternoon. She requested discontinuance of Seroquel based on negative advertising she had seen on television, and she was switched to Risperdal, with continuation of Lexapro. (R. 396)

Malmquist saw her counselor on February 16, 2007. Her mood was noted to be depressed and anxious. She was encouraged to do some volunteer work at a nursing home, and she was applying for low-cost housing. She reported some improvement in her

depression and anxiety at times, but stated it was hard for her to maintain the improvement. (R. 421)

On February 21, 2007, David Beeman, Ph.D. reviewed the record and completed a Mental Residual Functional Capacity Assessment form. (R. 401-04) He opined Malmquist would be moderately limited in her ability to maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically-based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. He found she would not have significant limitations from a mental standpoint in any other area. (*Id.*)

Malmquist saw her counselor on February 23, 2007. Her mood continued to be depressed and anxious, but her depression was somewhat better. She reported that she was getting out of bed more often and spending some time with friends. (R. 420) She next saw her counselor on March 6, 2007, and her mood continued to be anxious. She was very self-critical, especially of her parenting skills. She continued to remain sober. (R. 419)

Malmquist returned to see P.A. Middleton on March 27, 2007. Malmquist stated she had waited too long before re-ordering her medications from the indigent program, and she had been out of medications for a couple of days. She felt disorganized and distracted, but otherwise was doing "okay." The Risperdal had not helped her with racing thoughts. Her GAF was assessed at 60. She was restarted on the Lexapro, and a trial of methylphenidate was prescribed. (R. 411)

Malmquist saw her counselor on March 30, 2007. Her mood was noted to be dysphoric and disorganized, and she had difficulty concentrating. She reported a relapse with alcohol the previous week. (R. 418) She returned to see her counselor on April 6,

2007. She had not been drinking and her mood was somewhat better, with decreased depression. She was anxious about her financial situation. (R. 417) Her next visit with her counselor was on April 12, 2007. Her mood was good, but she reported being forgetful. She was more peaceful and was remaining sober. (R. 416)

Malmquist returned to see her counselor on April 27, 2007. Her mood was good, she was calmer, and she was remaining sober. She still experienced some depression but the episodes did not last as long and were less severe. (R. 415)

### 3.    *Vocational expert's interrogatory responses*

As noted previously, no VE testified at the ALJ hearing. Instead, interrogatories were submitted to the VE. (R. 181-85) The ALJ asked the VE to based her opinions on an individual with the following limitations:

> Assume that the claimant can lift 20 pounds occasionally and 10 pounds frequently and can stand and walk for a total of two hours in an eight-hour workday. Assume further that she can balance, stoop, crouch, kneel, crawl and climb occasionally. Finally assume that she is able to do only simple, routine, repetitive work involving only occasional contact with the public and performed at a regular pace but not any faster.

(R. 182, Question 11)

The VE responded that the hypothetical claimant would not be able to perform any of Malmquist's past relevant work, but would be able to perform other unskilled, sedentary jobs, including Final Assembler, Addressor], or Touch-up Screener. (R. 187)

The VE noted that if the hypothetical individual "could be expected to work at a slow pace for 1/3 of the day and have two or more absences from work each month all jobs listed would be precluded," and there would be no other jobs the individual could perform. (R. 187-88; *see* R. 184, Question 14)

## 4. The ALJ's decision

The ALJ found Malmquist had not engaged in substantial gainful activity since her alleged disability onset date of August 26, 2005. He found Malmquist to have severe impairments consisting of "affective disorder variously diagnosed, post-traumatic stress disorder, personality disorder, polysubstance dependence disorder in reported remission, degenerative disc disease of the spine with congenital fusion of thoracic vertebrae, and headaches." (R. 19) However, he further found none of her impairments, either singly or in combination, met the Listing requirements. (*Id.*)

With regard to Malmquist's mental impairments, the ALJ found that when Malmquist takes her medications as prescribed and avoids substance abuse, her symptoms generally are well controlled and she has only mild restrictions in her activities of daily living. He further found that when Malmquist is abusing substances, she has marked functional limitations that would meet Listing 12.09. (R. 20)

The ALJ found Malmquist "has the residual functional capacity to perform light work with the following exceptions":

> She is able to lift a maximum of 20 pounds occasionally and 10 pounds frequently. She is able to stand/walk for a total of two hours of an eight-hour workday On an occasional basis she is able to balance, stoop, crouch, kneel, crawl and climb. She is capable of no more than simple, routine repetitive work. She can tolerate no more than occasional contact with the public. She is able to work at no more than a regular pace.

(R. 21) In reaching this conclusion, the ALJ found Malmquist's subjective complaints regarding the extent of her limitations were not completely credible. He found the physical examination and diagnostic test results in the record do not indicate she has a physical condition that would restrict her physical activities to the extent alleged. He emphasized the fact that despite doctors' opinions that her back pain was primarily muscular in nature and not as significant as reported by Malmquist, she nevertheless continued to request

narcotics for her pain. (R. 22) The ALJ also observed that Malmquist's "work history prior to August 26, 2005, the date she alleges she became disabled, reflects limited earnings which may indicate that she was not competitively employed for reasons unrelated to disability." (R. 23)

The ALJ also found Malmquist's failure to refill her psychotropic medications in a timely manner, and failure to take her medications as prescribed, undermined her credibility. He also observed that Malmquist's friend, who completed a third-party function report (*see* R. 154-61), provided information suggesting that when Malmquist is sober, she functions at a higher level than her subjective complaints would indicate. (R. 24)

The ALJ noted that the record contains no opinions from treating physicians or medical professionals regarding Malmquist's mental or physical functional impairments. He afforded only limited weight to the opinion of the consulting examiner, Dr. Khoury, because he found Dr. Khoury's opinions regarding Malmquist's limitations to be inconsistent with the weight of the other evidence in the record. He gave greater weight to the opinions of the psychologists and physicians who performed paper reviews of the record. (R. 27-28)

The ALJ concluded that although Malmquist is unable to return to any of her past relevant work, she retains the residual functional capacity to perform a variety of sedentary, unskilled positions, and she is not disabled. (R. 28-29)

### III.  DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

#### A.  Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *Hillier v. Social Security Admin.*, 486 F.3d 359, 363 (8th Cir. 2007); *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, *supra*, 2007 WL 2593631 at *2 (citing *Bowen v. Yuckert*, 482 U.S. 137, 107 S. Ct. 2287, 98 L. Ed. 2d 119 (1987)).

The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and

speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)). *See Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) ("'The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work.' *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001), *citing Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996)."); *accord Kirby, supra*, 2007 WL 2593631.

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon, supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical

history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)); *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Page* 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion." Quoting *Haggard*, 175 F.3d at 594); *Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at 1022. The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health &*

*Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *accord Page*, 484 F.3d at 1042-43 (citing *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004); *Travis v.. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007); *Cox v. Barnhart*, 471 F.3d 902, 906 (8th Cir. 2006)).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823

F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)      the claimant's daily activities;
> 2)      the duration, frequency and intensity of the pain;
> 3)      precipitating and aggravating factors;
> 4)      dosage, effectiveness and side effects of medication;
> 5)      functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## IV. DISCUSSION

Malmquist argues the ALJ erred in concluding that substance abuse is a material factor contributing to her disability. The ALJ concluded that when Malmquist is abusing substances, her mental impairments meet the Listing level of severity, but when she is sober, they do not. (*See* R. 20) Malmquist argues the ALJ's conclusion is incorrect. She notes that although, as the ALJ found, her hospitalizations often followed episodes of

substance abuse, the ALJ failed to analyze her functional state immediately prior to the relapses. Malmquist argues her mental status deteriorated significantly prior to any relapse, and it was that decompensation that caused the relapse, not vice versa. (*See* Doc. No. 8, pp. 11-18, esp. p. 17)

The Commissioner argues, "The record clearly shows that on those occasions when [Malmquist] required hospitalization for psychiatric issues, she had been abusing alcohol and/or prescription medications." (Doc. No. 11, p. 16) The Commissioner points to numerous instances in the record that he claims indicate Malmquist abused alcohol and other drugs on an ongoing basis, rather than sporadically and infrequently as she claims. The Commissioner argues this case differs from *Brueggemann v. Barnhart*, 348 F.3d 689 (8th Cir. 2003), relied upon by Malmquist, in that here, the ALJ employed the proper analysis in making the threshold finding that Malmquist is disabled under Listing 12.09, considering the effects of substance abuse. The Commissioner argues that "every one of [Malmquist's] hospitalizations was due to decompensation caused by alcohol and prescription drug abuse." (*Id.*, p. 20)

The undersigned disagrees with the Commissioner's assessment of the record regarding the cause of Malmquist's hospitalizations. The evidence indicates Malmquist's use of alcohol and misuse of prescription drugs has been caused by her mental problems, and not that her mental problems have been caused by her substance abuse. Further, the record does not show that Malmquist has a consistent pattern of abusing alcohol, only that she has had sporadic relapses from maintaining total abstinence. Her hospitalizations are part of a longitudinal pattern of mental health symptoms and treatment.

Nevertheless, substantial evidence in the record supports the Commissioner's conclusion that when Malmquist stays sober and takes her medications as prescribed, her mood is greatly improved and she functions at a level that could allow her to work in a variety of unskilled, low-stress positions. The real question is whether she would be able

to *sustain* that type of work "day in and day out, in the sometime competitive and stressful conditions in which real people work in the real world.'" *Shaw v. Apfel*, 220 F.3d 937, 939 (8th Cir. 2000) (quoting *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982)).

The VE indicated that someone who "could be expected to work at a slow pace for 1/3 of the day and have two or more absences from work each month" would be precluded from any type of employment. (R. 187-88)  The only opinion in the record regarding Malmquist's work-related mental abilities is that of the consulting psychologist Dr. Morton, and he apparently did not review Malmquist's mental health treatment notes. (*See* R. 345)  The ALJ observed that "there are no opinions from treating physicians or treating psychiatrists in evidence," and Malmquist's "therapist who is a social worker and her physician's assistant, who prescribes her psychotropic medication, did not provide written opinions in connection with the claim regarding Ms. Malmquist's mental capacity." (R. 27)  Notably, Malmquist's treating mental health professionals were not asked to provide such opinions.  It is the ALJ's duty to develop the record fully and fairly, even when a claimant is represented by counsel.  *See Heckler v. Campbell*, 461 U.S. 458, 471 & n.1, 103 S. Ct. 1952, 1959 & n.1, 76 L. Ed. 2d 66 (1983) (Brennan, J., concurring) (ALJ's "duty of inquiry . . . rises to a 'special duty . . . to scrupulously and conscientiously explore for all relevant facts' . . .," citing *Broz v. Schweiker*, 677 F.2d 1351, 1364 (11th Cir. 1982)); *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993) (relevant inquiry is whether the claimant "was prejudiced or treated unfairly by how the ALJ did or did not develop the record; absent unfairness or prejudice, we will not remand.") (citing *Phelan v. Bowen*, 846 F.2d 478, 481 (8th Cir. 1988)).

The court finds the record is insufficient with regard to Malmquist's mental functional abilities, with the result that the record fails to contain substantial evidence to support the ALJ's determination that Malmquist is not disabled from a mental standpoint. The case should be remanded for further development of the record in this regard.  Upon

remand, the ALJ also should be directed to resolve the obvious inconsistencies between Dr. Morton's conclusions and the ongoing assessments of Malmquist's mental status by her treating therapist.

Malmquist also argues the ALJ erred in assessing her physical residual functional capacity. The court finds that although the record contains some evidence to the contrary, substantial evidence exists to support the ALJ's assessment of Malmquist's physical residual functional capacity.

## IV. CONCLUSION

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party files objections[2] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, that the Commissioner's decision be reversed and this case be remanded for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

**DATED** this 6th day of November, 2008.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[2]Objections must specify the parts of the report and recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72.